Marcoux v. Prim, 2004 NCBC 5

| | | |
|---|---|---|
| NORTH CAROLINA | | IN THE GENERAL COURT OF JUSTICE |
| | | SUPERIOR COURT DIVISION |
| COUNTY OF FORSYTH | | 04 CVS 920 |

| | | |
|---|---|---|
| RICHARD MARCOUX, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | ORDER AND OPINION |
| BILLY D. PRIM, ANDREW J. FILIPOWSKI, MARK CASTANEDA, DAVID L. WARNOCK, RICHARD A. BRENNER, STEVEN D. DEVICK, ROBERT J. LUNN and JOHN H. MUEHLSTEIN, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

{1}    This case arises out of Plaintiff Richard Marcoux's ("Marcoux") claim that Defendants Billy D. Prim, Andrew J. Filipowski, Mark Castaneda, David L. Warnock, Richard A. Brenner, Steven D. Devick, Robert J. Lunn and John H. Muehlstein (collectively the "Individual Defendants"), in their capacities as members of Blue Rhino Corporation's Board of Directors, violated their fiduciary duties by approving a merger with Ferrellgas Partners, L.P.  Plaintiff specifically asserts that defendants violated the fiduciary duties of loyalty and due care that directors owe to shareholders.  The corporation is not a party to this lawsuit.  This matter comes before the Court on plaintiff's motion for a preliminary injunction to prevent the shareholders from voting on the Merger as well as defendants' motion to dismiss.  The shareholders are scheduled to vote on April 20, 2004.

{2}    After considering the briefs and oral arguments, the Court denies defendants' motion to dismiss and denies plaintiff's motion for preliminary injunction.

*McDaniel & Anderson, L.L.P. by L. Bruce McDaniel; Milberg Weiss Bershad Hynes & Lerach, L.L.P. by William S. Lerach, Darren J. Robbins, Stephen J. Oddo, A. Rick Atwood, Jr., Randall J. Baron and Shaun L. Grove; and Robbins Umeda & Fink, L.L.P. by Marc M. Umeda and Jeffrey P. Fink for Plaintiff.*

*Bell, Davis & Pitt, P.A. by William K. Davis and Edward B. Davis for Defendants Billy D. Prim, Andrew J. Filipowski and Mark Castaneda.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P. by James T. Williams, Jr. and Mack Sperling for Defendants David L. Warnock, Richard A. Brenner, Steven D. Devick, Robert J. Lunn and John H. Muehlstein.*

PROCEDURAL BACKGROUND

{3}    This matter was designated a complex business case and assigned to the undersigned Special Superior Court Judge for Complex Business Cases by order of the Chief Justice of the Supreme Court of

North Carolina dated March 25, 2004.  A telephonic conference involving counsel for all parties was held on Tuesday evening, March 30, 2004.  Although the class action complaint filed February 12, 2004 involved challenges to the proposed merger, and the shareholders' vote on the merger was set for April 20, 2004, at the time of the telephonic conference neither a motion for preliminary injunction nor motion for expedited discovery had been filed, nor had any deposition been noticed.  Defendants' counsel had previously filed a motion to dismiss in conjunction with their answer to the complaint.  Plaintiff's counsel moved orally at the telephone conference for expedited discovery, while defendants' counsel opposed any discovery, asserting that the complaint is deficient on its face and discovery a mere fishing expedition.

{4}     Given the short history of the case and under these importunate time considerations, the Court established the following schedule by order dated April 1, 2004: opening briefs on plaintiff's motion for a preliminary injunction and defendants' motion to dismiss were to be filed by April 9, 2004; opposition briefs to plaintiff's motion for a preliminary injunction and defendants' motion to dismiss were due on April 13, 2004; and, because the presiding judge is concurrently in trial in another county, a hearing on plaintiff's motion for a preliminary injunction and defendants' motion to dismiss was held on April 15, 2004 at 7 p.m. and concluded at 10 p.m.  A motion to amend the complaint was filed on April 13, 2004.

{5}     The Court is placed in a procedural box.  Plaintiff filed his complaint three days after the merger was announced.  Marcoux had few, if any, facts upon which to base a claim.  Hence his allegations are conclusory in nature.  The Delaware courts have repeatedly urged plaintiffs to use the tools available under Delaware law before filing shareholder suits.  Plaintiff did not avail himself of that opportunity or wait for the proxy statement to be filed, but rushed to the courthouse in North Carolina.  He did not avail himself of the case management benefits of the North Carolina Business Court until March 23, 2004.

{6}     After having the benefit of the proxy statement and limited discovery, plaintiff has shifted his theory of the case in his motion for preliminary injunction to one of a failure to disclose and has moved to amend the complaint.  While the Court is not inclined to condone or encourage the filing of complaints without investigation supporting their basis, the Court is also cognizant of its duty to protect shareholders.  Accordingly the Court has addressed both the motion to dismiss and the motion for preliminary injunction.  Because plaintiff filed the motion to amend the complaint just days before the hearing, the Court has based its decision on the motion to dismiss on the original complaint ("Complaint").

## I.     FACTUAL BACKGROUND

### A.  THE MERGER

{7}     On February 9, 2004, Blue Rhino Corporation ("Blue Rhino") announced that it had entered into a merger agreement (the "Merger Agreement") with Ferrellgas Partners, L.P. ("Ferrellgas").  Blue Rhino is a Delaware corporation with its principal offices located in Winston-Salem, North Carolina.  The company is publicly traded on the NASDAQ, and institutional investors and mutual funds own 41% of Blue Rhino's outstanding common stock.  The primary business of Blue Rhino is exchanging propane cylinders and providing propane-related products.

{8}     Ferrellgas, a Delaware master limited partnership whose common units trade on the New York Stock Exchange, is a Fortune 1000 company as well as one of the nation's largest and fastest growing marketers of retail propane. Ferrell Companies, Inc. ("Ferrell") is a Kansas corporation that owns the general partner of Ferrellgas, as well as approximately 45% of the outstanding common units of Ferrellgas.

{9}     In addition to Ferrell's ownership interest in Ferrellgas, it also owns FCI Trading Corporation

("FCI") and Diesel Acquisition, LLC ("Diesel"). FCI Trading is a Delaware corporation and a Ferrell subsidiary established to purchase and sell energy commodities. Diesel is a Delaware limited liability company and a wholly owned subsidiary of FCI recently formed solely to effect the Merger with Blue Rhino.

{10} The Merger Agreement provides for shareholders of Blue Rhino to receive $17 in cash for each share of common stock owned, an amount representing a 22% premium over the closing price the day before the Merger announcement.[1] The Merger Agreement also includes a $10 million termination fee which is approximately 2.9% of the $340 million value of the Merger. It also contains a "fiduciary out" provision. Blue Rhino will hold a shareholders meeting on April 20, 2004, at which time its shareholders may vote to approve or block the Merger with Ferrellgas. If the shareholders approve the transaction, Blue Rhino will merge into Diesel and become a wholly owned subsidiary of FCI and thus part of the Ferrellgas organization.

## B. THE PLAINTIFF

{11} Marcoux owns 100 shares of Blue Rhino, which he purchased about a year ago for $10 per share. Plaintiff will make a $700 profit on his $1,000 investment if the proposed Merger goes through. Marcoux is also the plaintiff in a shareholder derivative action in California in which the Blue Rhino directors are defendants. No other shareholder has joined Marcoux in this suit or filed similar claims.

## C. THE BOARD OF DIRECTORS

{12} Plaintiff Marcoux filed this case as a class action, on behalf of the shareholders of Blue Rhino against the Individual Defendants, on February 12, 2004 in Forsyth County. Plaintiff seeks to enjoin the Merger, asserting that each member of Blue Rhino's Board of Directors (the "Board") violated his fiduciary duties of loyalty and due care by pursuing and agreeing to the Merger with Ferrellgas. Plaintiff named the following three persons, who constitute the inside directors on the Board, as defendants:

- Billy D. Prim ("Prim") serves as the chairman of the Board and chief executive officer of Blue Rhino. Prim was the co-founder of Blue Rhino and has served in the above capacities since establishing the company in March 1994. Prim owns 8.9% of Blue Rhino's common stock. Prim is credited with creating the business concept which made Blue Rhino successful.

- Andrew J. Filipowski ("Filipowski") is the vice chairman of the Board and was a Blue Rhino co-founder. Filipowski owns 11.5% of Blue Rhino's common stock.

- Mark Castaneda ("Castaneda") is Blue Rhino's chief financial officer and a member of the Board. Castaneda owns 1.2% of Blue Rhino's common stock.

{13} Plaintiff also named five other persons, who constitute the outside directors on the Board, as defendants in the Complaint:

- David L. Warnock ("Warnock) is a director of Blue Rhino since 2000. Warnock is the managing partner of the private investment firm Camden Partners, L.P. ("Camden Partners"). Warnock owns 20,007 shares of Blue Rhino, which accounts for less than 1% of the company's common stock. An affiliated entity of Camden Partners, Camden Strategic Partners II, LLC, owns 8.5% of Blue Rhino's common stock.

- Richard A. Brenner ("Brenner") is a director of Blue Rhino since 1998. Brenner is the chief executive officer of Ammar Garage Doors, a manufacturer and distributor of garage doors.

Brenner owns 62,646 shares of Blue Rhino, which account for less than 1% of the company's common stock.

- Steven D. Devick ("Devick") is a director of Blue Rhino since 1994. Devick is the chief executive officer of DDE, Inc., a management services company. Devick owns 41,194 shares of Blue Rhino, which account for less than 1% of the company's common stock.
- Robert J. Lunn ("Lunn") is a director of Blue Rhino since 1999. Lunn is the managing partner of the private investment firm Lunn Partners, LLC. Lunn owns 24,341 shares of Blue Rhino, which account for less than 1% of the company's common stock.
- John H. Muehlstein ("Muehlstein") is a director of Blue Rhino since 1995. Muehlstein is the managing partner of the law firm Pederson & Houpt, P.C. Muehlstein owns 40,546 shares of Blue Rhino, which account for less than 1% of the company's common stock.

{14} In connection with the Merger, the parties entered into a voting agreement that provided for several Blue Rhino shareholders to vote in favor of the Merger and in opposition to any measure adverse to the Merger. Prim, Filipowski, Camden Partners and Malcolm R. McQuilkin (the CEO of Blue Rhino Global Sourcing) agreed to the terms of the voting agreement. The combined common stock of these shareholders represents approximately 26.5% of the outstanding stock of Blue Rhino.

### D. MERGER NEGOTIATIONS AND THE SPECIAL COMMITTEE

{15} Blue Rhino employed several precautionary corporate governance and analytical measures before entering into the Merger agreement. First, the Board considered several other merger opportunities before electing to pursue the deal with Ferrellgas. For example, in November 2003 Blue Rhino entered into a confidentiality agreement with a Fortune 500 company (the "Fortune 500 company") to facilitate the exchange of information necessary to evaluate a potential acquisition by this entity. The Fortune 500 company, however, later decided that it could not acquire Blue Rhino and declined to make an offer.

{16} The impetus for the search for strategic alternatives was the entry of AmeriGas Partners, L.P. ("AmeriGas") into the market. As a direct competitor to Blue Rhino, AmeriGas had the power to drive down prices and margins in order to grab market share, an accomplishment made easier given the industry customer concentration in big box retailers. In the view of the directors, AmeriGas posed a threat which warranted the search for a larger partner. Awareness of that threat is a far more plausible reason for the merger than plaintiff's assertion that it was done to eliminate his derivative claim.

{17} After the Fortune 500 company declined to make an offer for Blue Rhino because of various business considerations, the Board authorized management to engage Banc of America Securities to find potential acquirers and explore other strategic alternatives. Shortly thereafter, Prim contacted Ferrell to gauge if there was any interest on their part to acquire Blue Rhino. In late December 2003, Blue Rhino and Ferrell executed confidentiality agreements and resolved to commence negotiations in the New Year. The parties commenced negotiations in January 2004, holding several meetings in Winston-Salem. On January 27 Ferrell offered to acquire Blue Rhino for $17 per share, which is the same price as the proposed transaction that is the subject of this dispute.

{18} Banc of America Securities, at the request of Blue Rhino management, continued, however, to evaluate other potential acquirers. On January 21 investment bankers from Banc of America Securities met with representatives of a foreign multinational corporation (the "foreign company") to determine if that organization had any interest in acquiring Blue Rhino. The foreign company informed Banc of America Securities that it had no interest. The foreign company believed that Blue Rhino was fully valued

at $13.50 per share. No entity other than Ferrellgas offered to merge with Blue Rhino.

{19} Second, the Board formed a special committee (the "Special Committee) consisting of independent directors to evaluate and negotiate the Merger. The Board formed the Special Committee on January 28, and the newly appointed members held their initial meeting that same day. Defendants point out that the Special Committee met seventeen times before the announcement of the Merger. The Board authorized the Special Committee to handle all aspects of the potential acquisition, including entertaining competing offers, and to ultimately recommend a course of action to the Board. The Special Committee members selected by the Board were four independent directors: Brenner, Devick, Muehlstein and Warnock. None of these independent directors had an interest beyond that of a shareholder or as the holder of options or warrants with their intrinsic value linked to Blue Rhino stock.

{20} On January 29 the Special Committee met, hired the law firm of Womble Carlyle Sandridge & Rice ("Womble Carlyle") to serve as its legal counsel, and engaged Banc of America Securities to prepare a fairness opinion evaluating the potential transaction with Ferrell. Following these first two meetings, the Special Committee held fifteen telephonic meetings in which Womble Carlyle apprised them of the negotiations and legal matters. During this same period, Banc of America Securities prepared their fairness opinion of the Merger.

{21} On February 7 the Special Committee met with Womble Carlyle and Banc of America Securities to consider the proposed Merger and the related documents, including the Merger Agreement, Plan of Merger, and Prim's employment agreement. The full Board was not present initially at this meeting and only joined the Special Committee when Banc of America Securities presented an updated financial analysis and its fairness opinion of the proposed transaction. After the financial presentation, the Special Committee again met without the other members of the Board. The Special Committee then considered the advantages and disadvantages of the Merger before unanimously concluding that the Merger was in the best interests of Blue Rhino shareholders and subsequently recommending that the Board approve the Merger.

{22} The Special Committee provided a report to the Board that included its reasoning for recommending the approval of the Merger with Ferrell. The Board considered the Special Committee's report and unanimously approved the Merger Agreement, Plan of Merger and related documents.

{23} Third, the Board obtained a detailed fairness opinion from Banc of America Securities that evaluated the merits of the Merger. Banc of America Securities arrived at its opinion after reviewing the financial statements, forecasts and stock performance of both Blue Rhino and other publicly traded companies. There is no company comparable to Blue Rhino. The bankers also examined this data in the context of the offer made by Ferrell to acquire Blue Rhino.

{24} Banc of Securities performed six analyses of selected transactions to arrive at the implied range of equity values for Blue Rhino common stock. The analyses produced the following results:

| Analysis Performed | Implied Range of Value for Blue Rhino Common Stock |
| --- | --- |
| Selected Publicly Traded Propane Companies | $16.00-19.00 per share |
| Selected Publicly Traded Consumer Companies | $10.00-14.00 per share |
| Selected Propane Acquisitions | $10.00-14.00 per share |
| Selected Consumer Company Acquisitions | $10.00-13.00 per share |
| Discounted Cash Flow Analysis | $13.50-18.50 per share |

| Leveraged Buyout Analysis | $11.00-14.00 per share |

The analyses, aside from the upper end of two, all produced an implied value well below the $17 per share offered by Ferrell. Thus, the bankers opined that from a financial standpoint the proposed Merger was fair to the shareholders of Blue Rhino common stock.

### E. PRIM'S EMPLOYMENT AGREEMENT

{25} The parties amended Prim's employment agreement because under the former agreement the Merger qualified as change of control, a qualification which triggered a potential payout to Prim. The Special Committee examined Prim's amended employment agreement with Ferrellgas and analyzed and compared the terms of both the existing and amended agreements.

{26} Under a change of control scenario, Prim had the option to terminate his employment within the twelve months following the closure of the merger. The termination of Prim's existing employment agreement entitled him to several benefits, including:

- Blue Rhino's would continue to pay his base salary of $600,000 per annum plus cost of living adjustments.
- Following the cessation of the base salary, Prim would receive cash retirement payments of $778,000 per annum for ten years.
- Ferrellgas would provide Prim health care coverage for fifteen years.

The Special Committee requested and received a comparison of the original employment agreement and Prim's contract that would take effect if the merger were consummated. The Special Committee determined the present value of the original agreement to be approximately $9.7 million in a change of control merger.

{27} The amended employment agreement retained Prim and prevented the Merger from qualifying as a change of control. The amended employment agreement includes the following key terms:

- Most notably, Prim would continue to work for the Blue Rhino following the merger. Prim would assume the position of executive vice president of Ferrellgas, Inc. and chief executive officer of the Blue Rhino Division of Ferrellgas Partners. Prim would also be nominated and recommended for election to the Board of Directors of Ferrellgas, Inc.
- Prim would receive an annual base salary of $600,000 for his service in the above capacity. If Ferrellgas terminates Prim "without cause" or Prim resigns for a "good reason" then Prim would continue to receive the base salary for one year.
- The agreement provides Prim with a three-year term and automatic one-year extensions if Ferrellgas does not terminate Prim 60 days before the end of any term.
- Prim is eligible for bonuses that do not exceed 100% of the above base salary. The agreement evenly splits the bonuses between discretionary and incentive based bonuses.
- Ferrellgas would make a one-time payment of $2.5 million to Prim in exchange for his agreeing to noncompetition and nonsolicitation clauses during the first three years of his employment with Ferrellgas.
- Prim may receive stock options to purchase 250,000 shares of Ferrell stock. The stock options are on a twelve-year vesting schedule. The Board of Ferrellgas shall determine the exercise price.
- A retention payment to Prim would be made on either the three-year anniversary of the

Merger, or Mr. Prim's termination of the amended employment agreement with good reason, or Ferrellgas' termination of Prim without cause. The retention payments consist of the difference between the $17 per share and the applicable exercise price for Prim's unvested Ferrellgas stock options. The projected retention payment is $1,882,240.

## F. PURCHASE OF PRIM'S REAL PROPERTY

{28}    Prim entered into an agreement to sell a five-acre parcel of property that he owns to Ferrellgas. The property had been in Prim's family for five generations. Prim did not want to sell the property, but Ferrellgas made it a condition of the transaction. Blue Rhino currently uses the property for propane storage, as a warehouse facility and for other operating purposes. Prim will receive $3.15 million of common units in limited partnership interest of Ferrellgas in exchange for his contributing the property. At least two directors thought Ferrellgas was paying more than fair market value but were convinced that overall no shareholder value had been diverted to Prim. Prim is the only witness to testify as to the value, and he stated that the purchase price equaled the replacement value of the manufacturing facility. He also testified that he did not wish to sell the property.

## G. REINVESTMENT BY KEY MANAGEMENT

{29}    Ferrellgas made Prim, Filipowski and McQuilkin agree to reinvest their net proceeds after taxes from the transaction as a condition to the Merger. The reinvestment reduced the amount of capital that Ferrellgas had to borrow to finance the transaction and was a condition to Ferrellgas consummating the merger.

## H. PLAINTIFF'S CONTENTIONS

{30}    Plaintiff, however, claims that several provisions in the Merger Agreement undermine the effectiveness of the aforementioned corporate governance and analytical measures. First, plaintiff claims that Prim's employment agreement with Ferrellgas, which names Prim as an executive vice president following the Merger, is suspect. Plaintiff cites several ordinary provisions in the agreement as questionable, including a $2.5 million lump sum payment and a $600,000 annual salary.

Plaintiff, moreover, particularly focuses on two clauses addressing Prim's assistance in litigation and confidential information. The clauses in Prim's employment agreement that plaintiff takes issue with are as follows:

> 11.1 ASSISTANCE IN LITIGATION. The Executive shall, upon reasonable notice, furnish such information and assistance to the Company as may reasonably be required by the Company in connection with any litigation in which it is, or may become, a party, and which arises out of facts and circumstances known to the Executive. The Company shall promptly reimburse the Executive for his out-of-pocket expenses incurred in connection with the fulfillment of his obligations under this Section.

> 11.2 CONFIDENTIAL INFORMATION. The Executive acknowledges that all Confidential Information has a commercial value in the Companies' Business and is the sole property of the Companies. The Executive agrees that he shall not disclose or reveal, directly or indirectly, to any unauthorized person any Confidential Information, and the Executive confirms that such information constitutes the exclusive properties of the Companies; provided, however, that the foregoing shall not prohibit the Executive from disclosing such information to third parties or governmental agencies in furtherance of the interests of the Companies or as may be required by law.

{31}     The alleged effect of these clauses is to stifle both a federal securities class action and a state shareholder derivative claim pending against the directors in California.  Plaintiff furthermore asserts that defendants sought a purchaser that would provide them with continued employment as well as protect them from potential liability in the other shareholder actions.  The result, according to plaintiff, was that the directors accepted a discounted share price from Ferrellgas in exchange for protecting their personal interests.  The Complaint, however, does not cite an employment agreement with Ferrellgas entered into by a Board member other than Prim.  More importantly, the proxy fully disclosed Prim's employment agreement with Ferrellgas.

{32}     Second, plaintiff claims the Board members possess private information that provides insight into the future value of Blue Rhino.  This information allegedly concerns the financial condition and prospects of Blue Rhino.  Plaintiff asserts that this information supports the proposition that the Ferrellgas offer does not adequately compensate Blue Rhino's shareholders for the company's present or future value.

{33}     Third, plaintiff claims that the Board failed to study the merger and acquisition market to obtain the highest bid possible for Blue Rhino's shareholders.  Defendants, however, claim that the Board considered many strategic alternatives before pursuing the transaction with Ferrellgas.

{34}     Fourth, plaintiff claims that Devick and Muehlstein did not qualify as outside directors and hence tainted the evaluation of the Merger.  The Complaint asserts that Devick had extensive business and personal relationships with Prim and Filipowski.  Plaintiff also claims that Muehlstein's law firm received legal fees in the past for its work on behalf of Blue Rhino as well as for the outside ventures of Prim and Filipowski.  Thus, plaintiff claims that Muehlstein does not qualify as an independent director.  Muehlstein and his firm ceased doing work for Blue Rhino after the passage of Sarbanes-Oxley.

{35}     Plaintiff seeks to enjoin the Merger with Ferrellgas and have the Court determine that the Board breached its fiduciary duties.  The prayer for relief also seeks to enjoin Blue Rhino from combining with any third party until the Board implements a procedure to obtain the highest possible price.  In addition, plaintiff seeks to tax defendants for cost and disbursements of this action, including reasonable attorney and expert fees.

## II.     ANALYSIS OF MOTION TO DISMISS

### A.  THE REQUIREMENTS OF MAINTAINING A DERIVATIVE ACTION

{36}     If this is a derivative action rather than a direct action, the plaintiff made three crucial mistakes as to the Complaint filed in this action.

> First, North Carolina law requires verification of the complaint in a derivative action:
>
> In an action brought to enforce a secondary right on the part of one or more shareholders or members of a corporation or an unincorporated association because the corporation or association refuses to enforce the rights which may properly be asserted by it, *the complaint should be verified by oath*.

N.C. Gen. Stat. § 1A-1, Rule 23 (b) (2003)(emphasis added).  Plaintiff simply did not verify the Complaint, which alone provides this Court the grounds for dismissal if this is a derivative action.  The verification requirement is not simply a technicality.  It is required for a reason and plaintiff must fulfill the requirement.

{37}     Second, plaintiff did not comply with Delaware law because he did not join the corporation as a

party. *See Agostino v. Hicks*, 2004 WL 569353 (Del. Ch. Mar. 22, 2004).

{38}    Third, the amended complaint does not contain allegations with respect to demand futility required by Delaware law. If this is a derivative action, it is subject to dismissal.

## B. ENJOINING THE NON-PARTY CORPORATION

{39}    Plaintiff seeks relief that clearly affects the corporation, which is not a named party to this action. The Complaint's prayer for relief included only the following:

A.  Declaring that this action is properly maintainable as a class action;

B.   Declaring and decreeing that the Ferrellgas Merger agreement was entered into in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

C.   Enjoining defendants from proceeding with the Ferrellgas Merger agreement and tender offer;

D.  Enjoining defendants from consummating the Merger, or a business combination with a third party, unless and until the Company adopts and implements a procedure or process, such as an auction, to obtain the highest possible price for the Company;

E.  Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of shareholders until the process for the sale or auction the Company is completed and the highest possible price is obtained;

F.  Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

G.  Granting such other and further relief as this Court may deem just and proper.

{40}    There is no claim for monetary damages on behalf of the shareholder or corporation in the Complaint. Plaintiff requests that the Court enjoin the directors from taking action to consummate the merger with Ferrellgas and require the corporation to use a different process to obtain the highest possible merger price. Clearly, this relief requires that the corporation halt its impending merger with Ferrellgas and then subsequently auction itself to the highest bidder. The Court cannot enjoin a corporation from merging with another entity if the corporation is not a party to this action. For that reason the Court would decline to enter an injunction against the non-party corporation.

## C. DERIVATIVE OR DIRECT ACTION?

{41}    This Court must determine if plaintiff's claims are direct or derivative under Delaware law. Plaintiff asserts his claims are direct. Defendants, however, argue they are derivative and thus subject to dismissal for failing to follow the required procedures for derivative actions. In *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 2004 WL 728354 (Del. Apr. 2, 2004), the Supreme Court of Delaware set forth a new standard to determine if a shareholder action was direct or derivative.[2]   With respect to the difference between a direct and a derivative claim the court stated as follows:

That issue must turn solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?

> [A] court should look to the nature of the wrong and to whom the relief should go. The stockholders claimed *direct injury must be independent of any alleged injury to the corporation.* The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing injury to the corporation.

*Id*. at *6 (emphasis added).

{42}      This Court has elected to address the direct/derivative issue in two ways. First, the Court has looked to determine whether the claims fall under a line of case typified by *Parnes v. Bally Entertainment, Corp.*, 722 A.2d 1243 (Del. 1999). *See also In re Ply Gem Indus., Inc. S'holder Litig.*, 2001 Del. Ch. LEXIS 84 (Del. Ch. 2001); *Golaine v. Edwards*, 1999 Del. Ch. LEXIS 237 (Del. Ch. 1999). That line of cases essentially holds that a shareholder may assert a direct claim based upon allegations that the merger price received by the shareholders of a target corporation is the product of a breach of the duty of loyalty by a fiduciary in which the directors acquiesced as a result of (a) being conflicted or (b) acting in bad faith. If plaintiff has adequately pled a *Parnes* claim he has a viable direct claim. *Tooley* approved the *Parnes* decision. This Court will address the adequacy of the pleading of a *Parnes* claim at the same time it addresses the likelihood of success on such a claim.

{43}      Second, the Court approached the claims as pure *Revlon* claims.[3]  This analysis is appropriate because the original complaint asserts *Revlon* claims and plaintiff did not change this approach with the filing of the amended complaint.

{44}      *Tooley* simplified the test to be applied and eliminated previously applied criteria such as "special injury." That case, however, did not address the specific issues raised by this motion to dismiss. This is a pure *Revlon* claim. Plaintiff does challenge the deal protection devices.

{45}      The question of whether claims that directors breached their *Revlon* duties are direct or derivative claims remains undecided under Delaware case law. The primary reason that the Delaware courts have to yet to resolve this issue is that most plaintiffs in Delaware file a derivative action to challenge the fulfillment of *Revlon* duties. Delaware courts usually excuse demand when *Revlon* complaints are properly pled. As a result, Delaware courts have not had the opportunity to tackle the issue of whether or not plaintiffs can file these claims as a direct action.

{46}      This Court must determine what the Delaware courts would decide on a motion to dismiss challenges to a pending merger wherein a plaintiff filed direct claims alleging breaches of *Revlon* fiduciary duties that prevent shareholders from receiving a fair price for stock. Two cases demonstrate the divergent views held by the Chancery Court.

{47}      In *Agostino*, the Delaware Court of Chancery advanced the argument that a plaintiff may not maintain a direct action solely because a transaction did not maximize return. The directors in *Agostino* issued warrants that transferred voting control of the company to another entity without compensating the shareholders. 2004 WL 569353 at *2. The plaintiff claimed the issuance of the warrants and the change in control prevented the corporation from pursuing other "value-maximizing transactions." *Id*. at *2. The plaintiff named the individual directors as defendants but did not join the corporation as a defendant. *Id*. at *1.

{48}      The *Agostino* court set forth the following test to determine whether an action is direct or derivative: "Looking at the body of the complaint and considering the nature of the wrong alleged and the relief requested, has the plaintiff demonstrated that he or she can prevail without showing an injury to the

corporation?" *Id.* at *7. The court found that the plaintiff offered no argument that precluding a value maximizing transaction would harm the shareholders differently than the company. The court held that the claim was derivative because the shareholder did not suffer an injury independent of the company. *Id.* at *10. The court also dismissed the complaint because the plaintiff did not join the corporation as a party. Thus, the mere decrease in the value of a business does not suffice to maintain a direct cause of action against directors.

{49}    Under *Agostino*, Chancellor Chandler views the injury to the corporation and all the shareholders to be identical, thus producing no "individual" injury to the shareholders.[4] Applying his reasoning to the case at hand supports a holding that Marcoux's *Revlon* claims are derivative.

{50}    The case of *In re Gaylord Container Corp. S'holder Litig.*, 747 A.32d 71 (Del. 1999) takes a different approach. In *Gaylord*, the plaintiffs alleged that the defendant's board of directors caused the plaintiffs special injury by restructuring the corporation and adopting a shareholder rights plan that entrenched the directors in office. The corporation adopted the shareholders rights plan in response to an acquisition proposal. The plan created a substantial obstacle for a potential acquirer. The plaintiffs sought to employ a direct action rather than pursuing derivative claims.

{51}    Vice Chancellor Leo Strine held that the complaint included direct claims because the plaintiffs alleged they suffered an injury distinct from the injury to the corporation. The court reasoned so because the shareholder rights plan was in response to an acquisition, and the action of the board prevented the shareholders from maximizing the value of their shares. The proceeds from the sale of the corporation affect the shareholders, not the corporate balance sheet.

{52}    Under the *Gaylord* reasoning, Vice Chancellor Strine would find that the "injury" in a *Revlon* claim is to the shareholders since the diminished value received in a merger flows to the shareholders. Although *Gaylord* involved deal protection devices, which directly impacted the shareholders' right to vote on the merger, thus making it a more individual injury to the shareholder, the focus clearly is on the injury, as in *Parnes*. The *Parnes* line of cases typically addressed claims for monetary damages.

{53}    Similarly the *Ply Gem* court, relying on the *Golaine* decision, decided that the allegations did support a direct action. The court used *Golaine* to apply the following reasoning:

> As Golaine frames it, "the real question underlying the teaching of Parnes [is] whether the Complaint states that the side transactions caused legally compensable harm to the target's shareholders by improperly diverting consideration from them to their fiduciaries." (footnote omitted).
>
> In short, the Complaint can be read fairly to allege that, as the result of the unfair process orchestrated by Silverman, Nortek reduced the per share price that it was willing to pay to the Ply Gem shareholders in order to increase the amount that it was willing to pay Silverman on his side transaction. (footnote omitted). Parnes teaches that such conduct will serve as the basis for individual or direct claims.

*Id.* at *19-20.

{54}    Plaintiff cites *Ply Gem* to support the proposition that a party may maintain a direct action that challenges the process of considering a merger as unfair. In *Ply Gem*, the plaintiff alleged that the acquirer reduced its offer by $0.75 per share to satisfy the demands of the target company's chief executive office and chairman of the board (the "CEO"). *Id.* at *13-14. The CEO allegedly manipulated the merger process to obtain an extravagant personal compensation package at the direct expense of the shareholders.

The plaintiff contended that benefits received by the CEO constituted over 10% of the total value of the merger.

{55}　　The contrary argument to Vice Chancellor Strine's position holds that the corporation is being sold as a result of this merger agreement.　Thus, if the price at which the corporation sells is unfair, then both the corporation and the shareholder suffer an identical injury.　Where the corporation and shareholder interests do not diverge, then the claim is derivative and not direct.

{56}　　While this Court might enjoy the opportunity to explore this issue in greater detail, the time constraints involved require a quick judgment as to the outcome if, by chance, the issue were to arise in Delaware.

{57}　　The Court concludes that the focus of the Supreme Court in *Tooley* on the "injury" involved leads to the conclusion that a plaintiff may bring a pure *Revlon* claim as a direct claim.　The "injury" results from the diminished value that a shareholder would receive from a merger process that prevents the shareholders from achieving the highest value for their shares in a change of control merger.　The treasury of the shareholder is depleted, not the treasury of the corporation.

{58}　　If Marcoux adequately alleged that Ferrellgas reduced its price to Blue Rhino shareholders to increase the amount paid to Prim in response to Prim's demands, then Marcoux adequately stated a direct claim.　For example, if plaintiff alleges that Prim refused to support the merger unless Ferrellgas diverted funds from the transaction to Prim, then a direct claim exists and the Complaint is not subject to dismissal.

{59}　　The Court will deal with the sufficiency of the pleading to assert both *Parnes* and *Revlon* claims along with plaintiff's likelihood of success on the merits in the preliminary injunction section of the order.

{60}　　Similarly, if plaintiff has adequately alleged failure to disclose in the Proxy Statement, then he has asserted a proper direct claim.　That, however, is not the claim asserted in the Complaint.

III.　　　ANALYSIS OF PRELIMINARY INJUNCTION

A.　THE PRELIMINARY INJUNCTION STANDARD

{61}　　The Delaware courts often address the issue of whether to enjoin a shareholder vote on a merger and the risks associated with the resultant delay of the proposed business combination.　The Court turns to the expertise of the Delaware Court of Chancery to establish the appropriate standard for evaluating the motion for preliminary injunction in this matter.　This Court must balance protecting shareholder rights with preserving the freedom of shareholders to approve or block a proposed merger according to their own economic interests.　A standard that is too lenient in either direction can have adverse repercussions on both shareholder rights and maximizing shareholder value.

{62}　　In *Phelps Dodge Corp. v. Cyprus Amax Minerals Corp.*, 2003 Del. Ch. LEXIS 210 (Del. Ch. Oct. 27, 1999), Chancellor William B. Chandler set forth a preliminary injunction standard requiring the moving party to demonstrate three elements. First, the moving party must show a reasonable likelihood of success on the merits.　Second, the moving party must demonstrate a reasonable threat of irreparable injury if the court does not issue an injunction. Third, Chancellor Chandler outlines "the balancing of the equities part of the test."　The balancing part of the test requires the moving party to show that the threat of injury from not issuing the injunction outweighs the possible injury from issuing the injunction.

{63}　　In *Phelps,* the court concluded that it should not enjoin the shareholder vote on the merger at

issue. Chancellor Chandler reasoned that the shareholders could simply vote down the merger if they wished to avail themselves of another transaction that provided a premium. Furthermore, the shareholders in *Phelps* also had the necessary information to render a fully informed vote. The court therefore found that "the risk to the transaction already on the table . . . outweighs the de minimus harm that Phelps Dodge and shareholder plaintiffs have asserted credibly here today."

{64} Delaware law is clear that in the absence of a competing offer a plaintiff must make a particularly strong showing on the merits to obtain a preliminary injunction because an injunction in such circumstances risks significant injury to shareholders. *In re The MONY Group, Inc. S'Holder Litig.*, 2004 Del. Ch LEXIS 16 (Del. Ch. 2004); *In re Aquila, Inc. S'holder Litig.*, 805 A.2d 187, 189 (Del. Ch. 2002). There is no competing offer here.

## B. REASONABLE LIKELIHOOD OF SUCCESS ON MERITS

{65} Plaintiff's Complaint is rife with conclusory allegations. The Court will examine both the adequacy of the pleading in the Complaint and the likelihood of success on the merits at the same time.

1. *Has plaintiff sufficiently alleged and is he likely to prevail on the merits in establishing a* Parnes *claim?*

*Prim's Employment Agreement*

{66} Plaintiff is particularly critical of Prim's amended employment agreement that he entered into with Ferrellgas. The Court must compare the amended employment with the terms of Prim's existing employment agreement in order to understand the ramification of the amendments.

{67} The parties structured the amended agreement to retain Prim following the merger. The consideration that Prim provides Ferrellgas in exchange for the added compensation is his continued service, or at least the assurance that he will not compete with the newly merged entity. For example, the vesting for the stock options is on a twelve-year schedule. The $2.5 million payment, moreover, is in exchange for Prim signing restrictive covenants that prevent him from working in the industry to the detriment of Ferrellgas. On the other hand, the former employment agreement merely provided Prim compensation for his services at Blue Rhino.

{68} The failure to amend the employment agreement would have resulted in a change of control that would have allowed Prim to terminate his employment following the closing of the Merger. The result under the prior agreement is that Prim would receive a total package of $3 million in salary and approximately $7.8 million in cash retirement payments from the new entity. Prim would not have to render any additional services and would receive these funds without providing any additional consideration. In contrast, the amended agreement prevents a change of control scenario and prohibits Prim from both receiving consideration without rendering services and potentially competing with Ferrellgas. The analysis presented to the Special Committee concluded that the future payments in the buyout package would total $11.2 million, not including the upfront golden parachute payment.[5] *See* Exhibits R and S to Affidavit of Richard A. Brenner.

{69} The amended employment agreement provides the new entity with the tangible benefit of preventing Prim from leaving and potentially siphoning business away from Ferrellgas in a new venture. The existing employment agreement would have allowed Prim to leave Ferrellgas following the Merger and to reap gains without providing further consideration. Therefore, allegations that the amended agreement unjustly enriches Prim have little basis.

{70}     The Court is convinced, upon a thorough review of the evidence of record, that the benefits to Mr. Prim from his individual contractual arrangements with Ferrellgas are no greater than, and in all probability less than, the benefits he would have received under his employment agreement with Blue Rhino in a change in control situation.  The Court is further convinced that the Special Committee made a good faith judgment to that effect.  The Court believes that defendants will ultimately prove that the share price was determined before any negotiation of Mr. Prim's employment agreement and that the terms of his agreement did not prevent an increased offer.

{71}     Mr. Prim did not condition his support of the Ferrellgas offer on any agreement on his individual benefits.  Rather, the completion of Merger and receipt by the shareholders of $17 per share depended upon Mr. Prim (and Mr. Filipowski) agreeing to certain conditions imposed by Ferrellgas which restricted their economic freedom.  There was no bribe and no "extraordinary" or "obscene" benefit to either Mr. Prim or Mr. Filipowski, and the proxy materials adequately disclosed the arrangement between them and Ferrellgas.

{72}     Plaintiff also has trouble fitting within the precise confines of *Parnes* because he failed to show that the Merger price reflects any differences in the value of Prim's contractual benefits with Blue Rhino and his benefits under the employment agreement with the purchaser.  Plaintiff offers no pricing rationale as to how the allegedly diverted benefits affect the share price.  In fact, plaintiff seeks no monetary recovery based upon diversion of benefits as was claimed in *Parnes*.

{73}     Plaintiff will be unable to demonstrate a breach of the duty of loyalty by Prim.  Plaintiff arguably sufficiently pled the claim but will not prevail on the merits because he cannot show that part of the merger value was diverted to Prim.

2.     *Has plaintiff sufficiently alleged and is he likely to prevail on the merits of his pure* <u>Revlon</u> *claim?*

     a.   <u>Revlon</u> *duties of Special Committee*

{74}     Plaintiff may have adequately stated a claim for the violation of *Revlon* duties in a conclusory fashion.  However, plaintiff will be unable to show that the Special Committee did not fulfill its *Revlon* duties.  The claim that the Special Committee failed to fulfill its *Revlon* duties, when it had only one offer to entertain and that offer was at a 22% premium, is a difficult proposition because the *Revlon* duties revolve around the Board obtaining the highest value possible for its shareholders.[6]

     a.   *Independence of Special Committee*

{75}     In *Aronson v. Lewis,* 473 A2d 805 (1984), the Supreme Court of Delaware set forth a test as to the independence and disinterestedness of directors.  In *Aronson*, the court found that a director qualifies as interested when he will obtain a personal financial benefit from the transaction at issue.  *In re Western National Corp. S'holder Litig.*, 2000 Del. Ch. LEXIS 82, at *37-38 (2000).  Such a benefit disqualifies a director as independent when stockholders do not equally share that benefit.  A director is also not independent if the transaction will adversely affect him, but not the corporation or other shareholders.  *Id.*

{76}     The *Aronson* court defined independence as deciding a corporate matter based on the merits presented to the board as opposed to extraneous considerations or influences.  473 A.2d 805 at (1984).  The *Western National* court established the plaintiff's burden in proving that a director does not qualify as independent by stating: "To establish lack of independence, a plaintiff meets his burden by showing that the directors are either beholden to the controlling shareholder or so under its influence that their decision is sterilized."  2000 Del. Ch. LEXIS 82, at *37-38 (2000).

{77}     The *Ply Gem* case specified the allegations that a plaintiff must assert to overcome the

presumption of independence as follows:

> Plaintiffs are confronted with the challenge of pleading facts that create, at a minimum, a reasonable doubt that the board members could not honestly and objectively evaluate the Nortek merger, with its related Silverman agreement, because of their relationship with Silverman. "Speculation on the motive for undertaking the corporate action" will not satisfy Plaintiffs' burden. *Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988). Similarly, the mere assertion of personal or business relationships will not defeat the presumption of independence. (footnote omitted).

2001 Del. Ch. LEXIS 84, at * 26.

{78}    Plaintiff's allegations questioning the independence of Devick and Muehlstein are merely assertions of personal and business relationships. These relationships alone do not suffice to defeat the presumption of independence.[7] Plaintiff alleges that Devick, Prim and Filipowski serve on the boards of each other's companies, belong to the same club and socialize frequently. The Complaint asserts that Devick and Filipowski often vacation together with their families in Maui to celebrate Christmas. Plaintiff speculates that these relationships motivated Devick to approve the merger.

{79}    Under the standard set forth in *Aronson* and *Western National*, these allegations do not demonstrate that Devick did not qualify as an independent director. Plaintiff alleges that these relationships exist but does not demonstrate that these relationships made Devick beholden to either Prim or Filipowski. The allegations only advance that the relationships exist, not that the relationship influenced or caused Devick's decision regarding the merger.

{80}    The evidence of record contains nothing to indicate that Mr. Prim possessed or exerted any leverage on Mr. Devick that caused him to divert benefits from the shareholders to Prim. A more colorable claim may be made for a lack of independence of Devick as to Filipowski, but that claim fails as well. Devick and Filipowski are friends and have invested in companies together. They also have sat on boards together and even served on each other's compensation committees in the past. The assumption that Devick was beholden to Filipowski, yet sacrificed the premium that he would receive from Ferrellgas' merger with Blue Rhino to benefit Prim, defies logic. Any reduction in price per share diverted to Prim would affect Devick and Filipowski dearly. Plaintiff's speculation that Devick worked for a lower merger price so Filipowski could later benefit from his Ferrellgas purchase after paying taxes on the sale of his Blue Rhino stock defies logic and has no support in the record.

{81}    Plaintiff alleges that Muehlstein did not qualify as an independent director because in the past his law firm represented Blue Rhino as well as various ventures of Prim and Filipowski. The receipt of legal fees by a director's law firm does not, by itself, demonstrate that director's lack of independence. *In re Ply Gem*, 2001 Del. Ch. LEXIS 84, at * 31; *McMillan v. Intercargo Corp.*, 768 A.2d 492, 503 (Del. Ch. 2000). Legal fees from the corporation must be substantial in proportion to the size of the firm to rebut the presumption that a director is independent. *See In re Ply Gem*, 2001 Del. Ch. LEXIS 84, at * 31. Blue Rhino, however, at the time of the merger no longer employed Muehlstein and his firm. Moreover, the merger would likely extinguish a great deal of business for Muehlstein and his firm if Blue Rhino still engaged his firm at the time of the merger. If his firm had hopes of receiving more legal work from Blue Rhino, then Muehlstein had an incentive to reject the proposed merger.

{82}    The independence of Warnock and Brenner are not seriously challenged. There is no evidence that they were conflicted in anyway other than the existence of the shareholder derivative action. Plaintiff

has not sufficiently alleged nor is he likely to prove at trial that the members of Special Committee had conflicts that compromised their independence.

{83}    Plaintiff's allegations fail to offer any proof that Devick or Muehlstein were subject to any significant leverage from Prim.  That they would sacrifice their own financial interests, their board seats and tens of millions of shareholder dollars so Prim could sell property he did not want to sell at greater than fair market value defies all logic and common sense.

{84}    Time constraints prevent the Court from dealing with each of the allegations made with respect to the independence of Devick and Muehlstein.  Likewise, those time constraints do not permit a thorough recitation of the applicable law.  The Court is cognizant of the need to scrutinize carefully any allegations of director conflict of interest.  The Court has done so here and is satisfied that the members of the Special Committee not only were independent for those purposes but also acted independently.   There is no showing that any of the Special Committee members were beholden to or under the control of Prim or Filipowski or that either of them controlled the activities of the Special Committee.  Mr. Brenner's independence is unchallenged, and he was the chairman of the Committee.  There is no evidence of record that Mr. Prim directed the Committee's work in any way.  There is evidence Mr. Brenner did.

### a.  The Board's Activities

{85}    The Board was not required to conduct an auction.  *Barker v. Amsted Ind.*, 567 A.2d 1279 (Del. 1989).  The Board tested the market before executing the Merger Agreement.  The Merger Agreement allowed the Board to pursue other offers by providing a termination fee.  In fact, the Board met with a Fortune 500 company, and its investment bankers met with a foreign multinational company.  Neither of these parties decided to make an offer.

{86}    After two months no other entity has expressed interest, and the market price reflects the reaction that the proposed transaction will occur without the substantial prospect of a competing bid.[8]  The Board did not reject other offers or improperly favor the Ferrellgas proposal because the Board did not have any other options.

{87}    Blue Rhino was facing for the first time a much larger competitor with the ability to drive down profit margins in order to take market share.  That posed a particularly dangerous scenario in the circumstances where Blue Rhino's customer base was heavily concentrated in four huge retailers.  The Board's decision to look at strategic alternative was prudent given the alternatives.

{88}    Moreover, the Board and Special Committee consisted of shareholders who would suffer an economic loss just as the ordinary shareholder would if this proved to be a bad deal.  Warnock's affiliates held 8.5% of Blue Rhino stock.  The Board had no incentive in this case to act improperly, and the plaintiff does not offer evidence to the contrary.  Plaintiff has not alleged nor is he likely to prevail on the merits at trial on a claim that the Board acted in bad faith.

{89}    Plaintiff is unlikely to prevail on the merits because the Special Committee was independent and made a good faith business judgment that the process chosen was in the best interests of shareholders.

*3.      Is plaintiff likely to prevail on the merits on the claim that shareholders are being misled or denied material information?*

{90}    When the proxy statement disclosures are challenged in a motion such as this, it becomes the Court's duty to see that shareholders have the information that they need to make a rational business judgment about whether to sell their shares for the merger price.  An alleged omission is material if the fact is one "that would have assumed actual significance in the deliberations of a reasonable shareholder."

*Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985). Plaintiff advances instances in which he claims the proxy was deficient. The Court will address each in turn.

### a. Sale of the Prim Property to Ferrellgas

{91} The proxy statement adequately discloses the Real Property Contribution Agreement. Plaintiff faults the proxy statement for not disclosing (a) that the property had a fair market value less than the amount Prim was receiving and (b) his proceeds might be tax deferred. Prim's tax situation is unresolved, and there was no need to speculate about it in the proxy. *See Mendell v. Greenberg*, 927 F.2d 667, 676 (2d Cir. 1991). His tax treatment would not be material. If this were a case in which any excess above the fair market value he received were funds diverted from shareholders, disclosure would be required. Here, the Special Committee concluded that in totality Mr. Prim's benefits received from Ferrellgas were (a) no more than he would received under his current agreement and (b) did not cause any diversion of funds from the shareholders to Prim. The Court also notes that Ferrellgas insisted in the transfer, and the property had a personal value to Mr. Prim over and above its fair market value.

{92} As in other instances there is no quantification by plaintiff by which the Court can judge the materiality of the alleged omission. Mr. Prim testified that it would cost about the same to build an equivalent facility. Lacking a measure of materiality, the Court is hard pressed to find an omission which would have been important to a shareholder.

{93} The real property transaction was adequately disclosed. It might have been preferable for the proxy to articulate the Board's decision-making process, but the necessary facts were disclosed.

### a. Merger Synergies

{94} Plaintiff faults the directors for failing to disclose the benefits of merger synergies. Plaintiff speculates that the shareholders might hold out for more if they thought Ferrellgas could afford to pay more. Such speculation is just that. Ferrellgas had made an offer substantially greater that than the market test indicated and had not budged on the price.

{95} The Special Committee had no quantifiable information on the synergistic benefit to Ferrellgas and would have been guessing in this regard. To make such a guess could well have misled shareholders into thinking that they could get more when there was no indication they could do so. Under Delaware law, Blue Rhino was under no obligation to create information to make subjective projections about potential synergies. *See In re Siliconix Inc. S'holder Litig.*, 200 WL 716787, at *10 (Del Ch. 2001); *In re Data Prod. Corp. S'holder Litig.*, 1991 WL 165301, at *8 (Del, Ch. 1991).

{96} The fact that the initial press release by both companies announcing the merger touted the synergies between the two companies did not obligate them to produce a study that quantified the synergies. A reasonable investor could infer from the premium paid that Ferrellgas expected some benefits from the merger. Blue Rhino was not required to disclose what it guessed Ferrellgas thought the synergies were worth. Given the premium paid for the shares and the lack of any quantifiable evidence of what synergies were worth, the Court is again hard pressed to find that the omission was one which would be material to a shareholder deciding how to vote.

### a. Shareholder derivative suits

{97} Plaintiff faults defendants for failing to disclose in the proxy statement the existence of his shareholder derivative action in California and the fact that Delaware law would operate to extinguish those claims upon consummation of the merger. Similarly, six federal securities law cases and a federal shareholder derivative action were pending in which the directors were defendants. Significantly those

other actions were all dismissed this week.[9]  Those dismissals highlight the speculative nature of derivative lawsuits, and it is unlikely that a reasonable investor would be influenced in this vote by the prospect of a speculative recovery by the corporation in a shareholder derivative action sometime in the future.

{98}     The Court is further hampered by the fact that plaintiff's complaint in the California action has never been made a part of this record so the Court can make a judgment as to its materiality to a reasonable shareholder in any event.  Undoubtedly there have been and will be occasions on which the existence of shareholder derivative suits are material.

{99}     There is no showing on this record that this is one of them. For all the Court knows, Marcoux's claim may be subject to the same basis of dismissal as the *Gish* shareholders derivative action.  This issue is controlled by *In re Siliconix Inc. S'holder Litig.*, 200 WL 716787, at *10  and *In re JJC Holding Co. Inc.*, 2003 WL 22246591, at *5 (Del. Ch. 2003).

### a.   Director's independence

{100}   The Court has already determined that plaintiff is unlikely to prove that the members of the Special Committee were not independent.  Therefore a claim that they failed to disclose a lack of independence would fail as well.

### a.   Banc of America's Fairness Opinion

{101}     After examining the depositions and reports, the Court finds that Banc of America's fairness opinion has more substance and proves more reliable than Dr. Hakala's (plaintiff's expert) position. Several problems existed with Hakala's declaration.  First, Hakala's declaration advocated that Banc of America's fairness opinion was flawed because it did not include an accretion analysis.  Hakala later agreed an accretion analysis was not a useful tool in a cash out merger such as the Blue Rhino and Ferrellgas transaction.

{102}     Second, Hakala maintained in his declaration that the fairness opinion should have included an evaluation of Blue Rhino compared to other propane companies.  It is difficult to contest the proposition that Blue Rhino is a unique company that does not lend itself to a study wit h comparable companies.  Hakala conceded that even Ferrellgas and Blue Rhino have little in common beyond dealing with the same product.

{103}   Third, Hakala asserted that Blue Rhino failed to disclose synergies from the merger with Ferrellgas in regards to the fairness opinion.  However, Hakala did not perform an independent analysis of the synergies and admits that attempting to value synergies is speculative.

{104}     Fourth, Hakala challenges in his declaration Banc of America's failure to account for a control premium and their use of a small stock premium.  As admitted by Hakala in his deposition, the central premium  in acquisitions is sometimes less than his suggested 30% and sometimes not a factor at all.  He also conceded that the small stock premium is a judgment call and that the disclosure in the proxy resolves any problem with its use.

{105}     The Court therefore finds that Dr. Hakala's major points lack merit and would not support a finding that the Banc of America Securities valuation was fraught with error or required material disclosures that were not made.


## B.  IRREPARABLE HARM

{106}     The harm that could result if the Court enjoins the shareholder vote is the loss of the 22%

premium that Ferrellgas offered for Blue Rhino. Plaintiff offers no evidence that another suitor will pay more or even the same amount per share for Blue Rhino. The marketplace affirms this conclusion in that Blue Rhino shares have yet to close above $17 since the merger announcement. An injunction threatens to leave the shareholders empty handed without either the offer from Ferrellgas or a replacement offer. The end result would likely be that Blue Rhino shares will begin to trade around the same $13 per share range as before the merger announcement.

## C. BALANCING OF THE EQUITIES

{107} The Court finds that plaintiff has not established a likelihood of success on the merits and that the balance of harm tilts in favor of letting the shareholder vote proceed next week. The potential damage to the shareholders from an injunction prohibiting the shareholder vote far outweighs the benefit associated with an injunction. The Court is convinced that the shareholders have adequate information to make an informed decision on whether or not to accept $17 per share for their stock and that the absence of another bidder increases the prospect for irreparable injury from the Court enjoining the merger.

## CONCLUSION

{108} Although this has been an expedited process, the Court is convinced that plaintiff is not likely to prevail on the merits in the claims asserted in the Complaint or the issues raised in the preliminary injunction motion. He will be unable to prove a *Parnes* claim because he cannot show any diversion of the merger consideration to Prim or others. He also will be unable to establish a *Revlon* claim. Rather, it appears to the Court that the directors secured the highest value possible for the shareholders in a change of control situation. The members of the Special Committee were independent for the purposes for which they were acting and acted to insure that the shareholders received full value and made a good faith judgment that no value was diverted to Prim or others in the process.

{109} Most importantly, where, as here, there are no other bidders, plaintiff must make a strong showing of likelihood of success on the merits to overcome the harm that could befall the shareholders if the merger is enjoined. Marcoux has not done so.

{110} The Court is less certain about its conclusion that this is a direct and not a derivative claim under Delaware law, but has made its best judgment in that regard. The alleged injury in the pure *Revlon* claim depletes the treasury of the shareholder and the Court believes that *Tooley* requires the Court to focus on that injury.

The motion to dismiss is denied.

The motion for preliminary injunction is denied.

Defendants have twenty days from today to respond to the motion to amend the Complaint.

SO ORDERED, this 16th day of April 2004.

---

[1] Since the merger announcement Blue Rhino stock has traded in the range of $16.72 to 16.97.

[2] In *Tooley*, the Supreme Court of Delaware also upheld the *Kramer* and *Agostino* decisions issued by the Chancery Court. 2004 WL 728354 at *3, 5.

[3] *See Revlon, Inc. v. MacAndrews & Forbes,* 506 A.2d 173 (Del. 1986). "[T]he duty of the board . . . changed from the preservation of Revlon as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit . . . . The whole question of defensive measures was moot. The directors' role changed from defenders of the corporate bastion to auctioneers charged with getting the best price from the stockholders at a sale of the company." 506 A.2d at 181.

[4] The Supreme Court of Delaware's decision in *Kramer v. Western Pacific Industries, Inc.*, 546 A.2d 348 (Del. 1988), explicitly illustrates the type of injury in which a shareholder may seek redress using a derivative action. In *Kramer*, the plaintiff alleged that two of the defendant directors of the target corporation negotiated and obtained compensation that decreased the value paid by the acquirer. *Id*. at 350. The court found that if the compensation directly resulted in a discount to the price paid by the acquirer for the target corporation, then the plaintiff should bring these claims as a derivative action. *Id*. at 353. The *Kramer* court reasoned that the claims are derivative in nature because the plaintiff based the claims on the diminished share value and stated:

> [W]here a plaintiff shareholder claims that the value of his stock will deteriorate and that the *value of his proportionate share of the stock will be decreased as a result of alleged director mismanagement, his cause of action is derivative* in nature. (citation omitted).
>
> A claim of mismanagement resulting in corporate waste, if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders. Any *devaluation of stock is shared collectively by all the shareholders*, rather than independently by the plaintiff or any other individual shareholder. Thus, the *wrong alleged is entirely derivative.*

*Id*. (emphasis added).

[5] The analysis also found that the total buyout, the present value of the future payment plus the upfront payment, would cost $9.6 million. *See* Exhibit R to Affidavit of Richard A. Brenner

[6] *See Revlon*, supra note 3, at 181.

[7] "Allegations of a mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about the director's independence." *Beam ex rel Martha Stewart Omnimedia v. Stewart*, 2004 LEXIS 162, at *22 (Del. Ch. 2004).

[8] *See supra* note 1.

[9] *See* Order of Dismissal, *Gish v. Prim*, CVO 3-04680-NM (AJWx) (U.S.D.C. Central District of Cal.) dated April 13, 2004, and Order Granting Motion To Dismiss Consolidated Complaint, *In Re Blue Rhino Corp. Securities Litigation*, CV 03-3495 NM et seq. (U.S.D.C. Central District of Cal.) dated April 12, 2004.