Investors Corp. of Vermont v. Bayer AG, No. 1011-04 Cncv (Norton, J., June 1, 2005)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT
Chittenden County, ss.:


INVESTORS CORPORATION OF VERMONT

v.

BAYER AG, ET AL.



ENTRY

This matter concerns allegations of unfair trade practices. The plaintiff, Investors Corporation of Vermont, has sued the defendants for allegedly restraining trade of Ethylene Propylene Diene Monomer (EPDM), a component of Ethylene-propylene elastomers, which are the third-most common forms of synthetic rubber in the world. Investors Corporation seeks to form a class of all Vermont persons or business entities that indirectly purchased EPDM from the defendants from January 1994 through December 2002. Investors Corporation claims violations of 9 V.S.A. §§ 2453, 2465 (Vermont antitrust law) and 9 V.S.A. §§ 2543, 2461 (Vermont consumer fraud law), as well as unjust enrichment.

The defendants move to dismiss pursuant to V.R.C.P. 12(b)(6) for failure to state a claim upon which relief can be granted. The defendants argue that damages are too speculative given that the putative class of plaintiffs are mere indirect purchasers of downstream products, of which EPDM formed only a component part. In essence, the defendants' argument is that the putative class lacks standing under the Vermont antitrust and consumer fraud law.

In the alternative, the defendants request that this court stay this action pending resolution of a federal action by direct purchasers of EPDM. This federal action has been consolidated in the U.S. District Court for the District of Connecticut. See In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig., 277 F. Supp. 2d 1373, 1373 (2003).

The defendants argue that such a stay is warranted given the Vermont statute's directive that courts "take all necessary steps to avoid duplicate liability, including but not limited to the transfer or consolidation of all related actions." 9 V.S.A. § 2465(b).

A Rule 12(b)(6) motion "should not be granted unless it is beyond doubt 'that there exist no facts or circumstances that would entitle the plaintiff to relief.'" Richards v. Town of Norwich, 169 Vt. 44, 48 (quoting Amiot v. Ames, 166 Vt. 288, 291 (1997)). The court "assumes that all factual allegations pleaded in the complaint are true . . . accept[ing] as true all reasonable inferences that may be derived from plaintiff's pleadings." Id. at 49. "A court should be 'especially reluctant to dismiss' a cause of action on the basis of the pleadings when the theory of liability is novel or extreme unless, 'beyond doubt, there [are] no circumstances or facts which plaintiff[] could prove which would entitle [her] to relief.'" In re Judicial Review of A.G., 151 Vt. 167, 169 (1989) (quoting Assoc. of Haystack Property Owners, Inc. v. Sprague, 145 Vt. 443, 446–47 (1985)) (second and third alterations in original).

The Vermont Consumer Fraud Act provides broad remedies for consumers injured by unfair trade practices and antitrust violations. "The Act expressly states that any consumer, reinforced by the definition of consumer as 'any person,' who suffers injury may bring an action under the statute against a 'seller, solicitor or other violator.'" Elkins v. Microsoft Corp., 174 Vt. 328, 331 (2002) (quoting 9 V.S.A. §§ 2453(a), 2461(b)). Moreover, "the express legislative intent behind the statute [is] to 'protect the public' against 'unfair or deceptive acts or practices' and to 'encourage fair and honest competition.'" Id. (quoting 9 V.S.A. § 2451). "In light of this purpose, . . . the VCFA is 'remedial in nature' and therefore must be construed 'liberally so as to furnish all the remedy and all the purposes intended.'" Id. (quoting State v. Custom Pools, 150 Vt. 533, 536 (1988)). "Of course, liberal construction does not allow [courts] to stretch the language beyond legislative intent." Id.

In a recent ruling, this court held that a putative class of consumers did not have antitrust standing to sue Visa and Mastercard for alleged injuries they incurred by

purchasing items from merchants who used financial services from these institutions. See Fucile v. Visa U.S.A., Inc., No. S5160-03 CnC, 2004 WL 3030037 (Dec. 27, 2004) (Norton, J.). Visa and Mastercard had settled a multidistrict class action from merchants who alleged that the defendants had tied debit card services with credit card services in violation of federal antitrust law. See id. at *1 (citing In re Visa Check/Mastermoney Antitrust Litig., 297 F. Supp. 2d 503 (E.D.N.Y. 2003)). The plaintiff, Fucile, argued that the inflated costs of these financial services were passed along to consumers by merchants who used them. In dismissing this complaint, this court adopted the antitrust standing principles articulated in Associated General Contractors v. Calif. State Council of Carpenters, 459 U.S. 519 (1983), at least to the extent that these principles were consistent with Vermont law, which, unlike federal law, allows indirect purchaser suits. Applying the Associated General Contractors factors, this court held that Fucile's injury was too attenuated and remote from the alleged antitrust violation and his damages were too speculative. Fucile at *4–5. Fucile therefore lacked antitrust standing.

Here, Investors Corporation stands in a different posture than Fucile. Unlike Fucile, Investors Corporation and the putative class purchased the item allegedly affected by the defendant's actions (i.e., EPDM), albeit in varied forms as a component of Ethylene-propylene elastomers. According to the complaint, EPDM comprises 80 to 85 percent of Ethylene-propylene elastomers. Financial services, by contrast, are not components of common consumer goods, except, perhaps, in an extraordinarily abstract sense. Given that EPDM is a significant component of the product that putative class members purchased, the injury in this case is not as attenuated and remote and the damages are not as speculative.

As this court stated in Fucile, the relevant factors from Associated General Contractors are (1) whether there is a causal connection between the antitrust violation and the alleged harm, 459 U.S. at 537; (2) the directness of the injury, considering the "chain of causation," id. at 540; (3) whether the violator had an improper motive, id. at 537 and n.35; (4) whether the plaintiff's injury was of a type that Congress sought to redress by providing a private remedy, id. at 538; (5) whether the alleged damages are speculative, id. at 542; and (6) whether the nature of the action will keep "the scope of complex antitrust trials within judicially manageable limits," id. at 543.

Applying these factors to the instant case, there first exists a causal connection between the defendants' alleged price fixing and the putative class's injury. Because

3

EPDM is a significant component part of the finished rubber products at issue, an increase in its price could have a ripple affect in the finished products, thereby increasing prices for the ultimate consumers.

The defendants argue that there are countless other inputs that determine the ultimate price of Ethylene-propylene elastomers, such as different marketing by third-party sellers, different forms of distribution, and different types of manufacturing. These multiple variables, the defendants argue, render injury and damages impossibly speculative, and therefore the causal chain cannot be established. This may or may not be true, and other courts have expressed strong concerns about stretching antitrust law to cover damages in cases like these. See, e.g., Crouch v. Crompton Corp., Nos. 02 CVS 4375, 03 CVS 2514, 2004 WL 2414027, *18–25, 2004 NCBC 7, ¶¶ 71–86 (N.C. Super. Ct. 2004) (analyzing complexity and costliness of adjudicating antitrust case based on rubber compounds and chemicals that form component of tire products at issue).[1] Indeed, the court in Crouch noted, citing a plea agreement from Canada, that at least in the case of tires, rubber compounds and chemicals form a mere 1 percent of the ultimate price of the finished product. Id. at *20–21, 2004 NCBC 7, ¶ 76 (citing The Queen v. Crompton Corp. [2004] F.C. ----).

Such facts, however, are far afield Rule 12(b)(6) motion analysis. The court will be better suited to assess whether Investors Corporation will be able to prove causation based on the alleged antitrust violation at the class certification and summary judgment stages. At this point in the proceeding, however, the court is not confident in holding that Investors Corporation lacks an ability to show causation. See Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 989 (9th Cir. 2000) (holding that "disputed claims of causation and injury cannot be decided on a Rule 12(b)(6) motion"). Hence, factors one and two weigh in favor of standing.

---

[1] Of course, the court's concerns in Crouch were partially based on the lack of express statutory indirect purchaser standing in North Carolina or any definitive ruling by the North Carolina Supreme Court on indirect purchaser standing. Id. at *10–12, 2004 NCBC 7, ¶¶ 46–50. This is not the case in Vermont. See 9 V.S.A. § 2465(b); Elkins, 174 Vt. at 337–38 (holding that § 2465(b) was mere clarification and Vermont consumer fraud law has always allowed indirect purchaser suits).

4

Second, the court can infer an improper motive based on Investors Corporation's allegations. The alleged price-fixing was a conspiracy throughout U.S. and European markets, evidenced by coordinated price hikes close in time and amount. Investors Corporation alleges that defendants met during the class period; discussed prices, customers, and markets; agreed to charge prices at certain levels; issued price announcements in conformance with these agreements; and allocated markets and customers in accordance with these agreements. One defendant, Crompton Corporation, has pleaded guilty to violating antitrust laws, and others have been contacted by antitrust authorities. These facts are enough to infer that the defendants had an improper motive to injure consumers like Investors Corporation and those in the putative class by allegedly fixing prices at artificially high levels. See Sullivan v. Tagliabue, 828 F. Supp. 114, 117 (D. Mass. 1993) (finding sufficient evidence to raise issue as to improper motive where plaintiff alleged that defendant sought to restrain and monopolize commerce and took action toward that goal). The third factor therefore weighs in favor of standing for Investors Corporation.

Third, the injury that Investors Corporation and the putative class suffered appears to be within the type of injury that the Legislature intended to address through the Vermont antitrust and consumer fraud law. If Investors Corporation can demonstrate that the increased EPDM prices affected the price of the goods purchased, then it will have established the type of injury to indirect purchasers that the Legislature intended to remedy by allowing indirect purchaser suits. The fourth factor weighs in favor of standing for Investors Corporation.

Finally, as the court noted above, the damages may be somewhat speculative, and this weighs slightly against standing. But the court is not confident at this stage that Investors Corporation will not be able to employ economic models to assess how the price of EPDM affected the price of downstream products. As the U.S. Court of Appeals for the Ninth Circuit has recognized, "Complex antitrust cases . . . invariably involve complicated questions of causation and damages." Forsyth v. Humana, Inc., 114 F.3d 1467, 1478 (9th Cir. 1997). This case will likely prove to be no exception, but that is not reason enough to dismiss for lack of standing.

Considering this analysis, the court holds that Investors Corporation has standing to bring this antitrust and consumer fraud action. At the same time, however, the court does not wish to enunciate a bright-line rule regarding antitrust standing. As the Supreme

5

Court of the United States noted in <u>Associated General Contractors</u>, standing determinations must ultimately rest on case-by-case analyses. 459 U.S. at 536–37 (1983). The court does not wish to suggest that in all cases where a product affected by anti-competitive behavior is a component of a finished product, antitrust standing exists for the consumer of the finished product. There may well be cases where products form such an minuscule portion of the finished product that antitrust standing is lacking. Indeed, in an abstract and theoretical way, the financial services in <u>Fucile</u> were part of the consumer goods at issue in that these goods could not have ultimately fallen into the hands of all paying consumers without the transactional means that were affected by price fixing. But even if the court were to consider such transactional means to be a part of the consumer goods as EPDM is to finished rubber products, they form an entirely less significant portion of the consumer goods. Transactional means of acquiring goods, therefore, cannot provide grounds for standing to sue the entities that provided them.

The defendants also argue that Investors Corporation lacks standing to bring an unjust enrichment claim because Investors Corporation and members of the putative class did not directly confer any benefit to the defendants. Vermont law does not require that the enrichment be directly conferred from one party to another in order for the latter party to have a colorable claim for unjust enrichment. "Under a quasi-contract theory of unjust enrichment, the law implies a promise to pay when a party receives a benefit and retention of the benefit would be inequitable." <u>Brookside Memorials, Inc. v. Barre City</u>, 167 Vt. 558, 559 (1997) (mem.).

As with the antitrust and consumer fraud claims, the link between purchases by Investors Corporation and the putative class and benefits to the defendants may be tenuous, but it is still properly alleged in the complaint. Moreover, because of the alleged antitrust and consumer fraud activities, it would be inequitable for the defendants to retain these benefits. Investors Corporation has therefore stated a valid unjust enrichment claim. The fact that Investors Corporation and the putative class did not deal directly with the defendants is not relevant, as long as the elements for unjust enrichment are pleaded. See <u>In re K-Dur Antitrust Litig.</u>, 338 F. Supp. 2d 517, 544–45 (D.N.J. 2004); <u>In re Cardizem CD Antitrust Litig.</u>, 105 F. Supp. 2d 618, 670–71 (E.D. Mich. 2000).

Finally, the defendants argue in the alternative that the court should stay this action pending resolution of the federal direct purchaser action, contending that the Vermont Consumer Fraud Act's instruction that courts "take all necessary steps to avoid

6

duplicate liability" suggests that a stay is appropriate. Antitrust law in the United States has an inherent problem of duplicate liability. Federal courts do not allow antitrust defendants to use a pass-on defense to show that the damages from anticompetitive behavior were ultimately absorbed by downstream purchasers. See Illinois Brick Co. v. Illinois, 431 U.S. 720, 724–26 (1977). At the same time (and as a result of the no pass-on defense rule), federal courts also do not allow antitrust suits by indirect purchasers. See id. at 730–35. Therefore, defendants in federal court are liable for all damages, even if a plaintiff was able to relay the costs of anticompetitive activities to downstream consumers. Most states, including Vermont, however, have passed "Illinois Brick Repealer" laws, allowing indirect purchasers to recover for injuries related to antitrust violations. Donald I. Baker, Federalism and Futility: Hitting the Potholes on the Illinois Brick Road, 17-Fall Antitrust 14, 14 (2002). Because most state indirect purchaser antitrust actions stem from federal direct purchaser actions, see Ronald W. Davis, Indirect Purchaser Litigation: ARC America's Chickens Come Home to Roost on the Illinois Brick Wall, 65 Antitrust L.J. 375, 376 (1997), damages will inevitably be assessed twice against an antitrust defendant: once by the direct purchasers for all damages, even those passed along down the distribution chain, and then again by the indirect purchasers for whatever damages were actually passed along the distribution chain. Id. at 397–98; Baker, supra, at 16–17; see also Crouch v. Crompton Corp., Nos. 02 CVS 4375, 03 CVS 2514, 2004 WL 2414027, *15–17, 2004 NCBC 7, ¶¶ 60–65 (N.C. Super. Ct. 2004) (discussing North Carolina cases triggered by events on federal level).

At first glance, the provision cited by the defendants would seem to combat this double recovery problem. But the very allowance of indirect purchaser antitrust suits gives rise to duplicate liability in the sense described above. Even if the court were to stay this action and await final resolution of the federal action, Investors Corporation and the putative class would still have a right to recover for injuries passed along to them from the direct purchasers under Vermont's statutory scheme.

A more reasonable interpretation of the "all necessary steps" provision is that the legislature intended consolidation of cases within Vermont to avoid overlapping damages to various classes. Indeed, the "steps" that the legislature identified included "transfer or consolidation of all related actions." 9 V.S.A. § 2465(b). Such steps would not address the duplicate liability that occurs with both federal direct purchaser and state indirect purchaser suits.

7

The court also notes that it could find no other state <u>Illinois Brick</u> repealer laws requiring stays in a case such as the instant action. Several state statutes include similar language, see, e.g., 740 Ill. Comp. Stat. 10/7-2 ("[I]n any case in which claims are asserted against a defendant by both direct and indirect purchasers, the court shall take all steps necessary to avoid duplicate liability for the same injury including transfer and consolidation of all actions."); Minn. Stat. § 325D.57 ("In any subsequent action arising from the same conduct, the court may take any steps necessary to avoid duplicative recovery against a defendant."); N.Y. Gen. Bus. Law § 340(6) ("In any action in which claims are asserted against a defendant by both direct and indirect purchasers, the court shall take all necessary steps to avoid duplicate liability including but not limited to the transfer and consolidation of all related actions."); S.D. Codified Laws § 37-1-33 ("In any subsequent action arising from the same conduct, the court may take any steps necessary to avoid duplicative recovery against a defendant."), but state courts have not defined these provisions to require stays in circumstances like those in this case.

The court could find only one statute that expressly warrants stays pending resolution of out-of-state direct purchaser litigation, but such stays are only authorized where indirect purchasers have obtained a judgment or settlement "prior to the completion of a direct purchaser's action." Haw. Stat. Ann. § 480-13(c)(7). Hawaiian courts are required to delay disbursement of damage awards to indirect purchasers until the direct purchasers' suits are resolved, the statute of limitations has run, or "in such a manner that will minimize duplication of damages to the extent reasonable and practicable." <u>Id</u>. Even this statute seems to recognize that duplication of damages will occur; it simply attempts to minimize such duplication. These statutes provide little guidance, but they do not support the issuance of stay in this action.

The defendants cite <u>Asher v. Abbott Labs.</u>, 307 A.D.2d 211, 212, 763 N.Y.S.2d 555, 556 (N.Y. App. Div. 1998), in support of a stay pending a federal action. This court's reasoning in this case, however, had nothing to do with New York's statutory mandate that courts "take all necessary steps to avoid duplicate liability" in state antitrust cases. Rather, the appellate court merely held that interests of "comity, orderly procedure, and judicial economy" required a stay pending the conclusion of the federal action, particularly where "the federal action commenced first and discovery [had] been completed." <u>Id</u>. at 211; 763 N.Y.S.2d at 556.

8

The court is similarly inclined to abide by the goals of comity, orderly procedure, and judicial economy, but the defendants have provided little argument that a stay in this case would serve these goals. Although the multidistrict action in federal court is off to a head start, its discovery may not encompass the same areas necessary in this case, especially because injury here, if any, will involve costs passed down a distribution chain. Federal direct purchaser suits do not delve into such matters. The court therefore sees no need to halt this action only to have to engage in discovery anyway after the federal action concludes.

Moreover, issuing a stay and delaying a recovery for Investors Corporation and the putative class potentially for years would be contrary to the broad remedial purpose of the Vermont Consumer Fraud Act. As the court noted above, "the [Vermont Consumer Fraud Act] is 'remedial in nature' and therefore must be construed 'liberally so as to furnish all the remedy and all the purposes intended.'" <u>Elkins v. Microsoft Corp.</u>, 174 Vt. 328, 331 (2002) (quoting <u>State v. Custom Pools</u>, 150 Vt. 533, 536 (1988)). A stay would not conform with this statutory purpose.

ORDER

For the foregoing reasons, the defendants motion to dismiss and alternative motion for a stay are DENIED.

Dated at Burlington, Vermont, June 1, 2005.

_____/s/_____
Richard W. Norton    Judge

9